Case number 24-1352. Maryland Office of People's Counsel, et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Schwartz for the petitioners, Mr. Perkins for the respondents, Mr. Hughes for the interveners. Ms. Schwartz, good morning. Good morning, and may it please the Court. Jeffrey Schwartz for the customers. The Federal Power Act requires that all wholesale electricity rates be just and reasonable, and makes no exception for auction set rates. And under Section 206, if FERC finds an existing rate to be unjust and unreasonable, it must set a new just and reasonable rate to be observed thereafter. FERC here concedes that it may exercise this authority over auction set rates in other cases. And it concedes that a mistaken parameter in this auction caused exorbitant prices that its brief calls wasteful and its commissioners called patently inequitable and blatantly unjust and unreasonable. Those rates charge Delmarva customers an extra $180 million for no economic or liability purpose. Although it recognized the injustice, FERC denied the customer complaint because it wrongly believed a Third Circuit decision foreclosed relief. Here's why that's wrong. Power providers rejected a change to the auction's rate-setting process. To implement the decision, FERC reversed the change and PGM reran the auction with the original parameter. That fulfilled the Court's mandate, ended the dispute about how the auction should run, and created new forward sales commitments at the higher prices. The complaint here posed a new question, which the Third Circuit did not decide, whether the resulting capacity prices were just and reasonable, as required by Section 206 and this Court's precedent in Public Citizen and New England Power Generators on review of FERC's decision in Devon Power. The parallels between this case and Public Citizen are striking. In both cases, an auction was held under FERC-approved rules. The auction produced anomalous prices, which complainants challenged before capacity delivery began. FERC acknowledged the misfire and changed the tariff going forward, but it refused to evaluate whether the completed auction's results were just and reasonable. So, you agree that your proposed fix would have the exact same economic effect as the fix that the Third Circuit declined to impose, right? Or, in fact, held was contrary to the file-of-right doctrine. Well, the Third Circuit was not ruling on an economic outcome. It was ruling on a change to the auction's rate-setting process, and found that it was too late to change the auction rate-setting process, and found that the potential inequities of setting such a rate could not save an impermissibly retroactive change. What we are challenging in this case is... I think what FERC is going to say, or what they did say, is if we now grant your 206 challenge to the price and institute the price using the wrong auction rules, we would essentially be defying the Third Circuit. So, why is it unreasonable for FERC not to want to be seen to be defying the Third Circuit's bottom-line conclusion? So, two points, Your Honor. First, if the rates produced by the existing auction under the old rules are unjust and unreasonable, then it becomes FERC's obligation to set a just and reasonable replacement rate. We requested a replacement rate that tracked the results of the February 2023 auction because those auction results are market-based. They reflect the accurate reliabilities and supply and demand conditions in the market. So, we thought that was a just and reasonable replacement rate. If FERC believes that for some reason that replacement rate is unavailable, then it's FERC's obligation to develop a different just and reasonable replacement rate. And I would add that the Third Circuit disclaimed consideration of the equities. It never held that the February 2023 prices were unjust and unreasonable or that the May 2024 prices would be just and reasonable. That was sideways to the question before the Court in that case whether that change was retroactive. Contrary to FERC's view — So, if you attach a new legal consequence to past actions, that is essentially what the Third Circuit said was impermissible. And they would say you are, in effect, nullifying the outcome of the auction. So, why can you do that? I would disagree, Your Honor. So, in the power provider's case, what was sought was a rule change that would have produced the prices that came out of the February 2023 auction, the low prices that we think are just and reasonable. It would have been then the generator's obligation to challenge those rates and prove that they are unjust and unreasonable. Instead, on remand, FERC reversed the change to the rate-setting process, reran the auction with the original parameter, and produced the higher rates that we now contend are unjust and unreasonable. So, the outcome of the rate-setting process flipped the burden to challenge the resulting rates, and we accept that burden. In effect, what the Third Circuit held was that the attempt to change the rate-setting process in the middle of the auction was invalid and ineffective. The result was that the auction was completed in compliance with the rules that were in place when the auction started, just as was the case in public citizen. And just as was the case in public citizen, FERC acknowledged that there was a problem with those rules, which it changed going forward. And FERC has an obligation to consider whether the results of the completed auction were just and reasonable. Kind of a practical question. When PJM filed its Section 206 complaint back in December of 2022, it requested a refund date effective December 23, 2022. And how could that have worked in practical terms if the Commission had granted the 206 complaint rather than PJM Section 205? Filing, how could refunds have been paid for a rate that wouldn't come due until 2024? I don't think that in the earlier Section 206 case, the refund effective date literally would mean refunds. I think it's something that is requested as a— It would be an offset, a sexual refund, ex ante, something like that. Yeah. I mean, had FERC acted pursuant to Section 206 before the auction was completed, the auction would not have produced any unjust and reasonable rates to refund. I mean, I think— So the 206 complaint was sort of a nullity at that point or didn't come into play. It's a preservation. Well, PJM filed under both 205 and 206, I think, out of an abundance of caution and to give FERC additional flexibility. If it didn't like the specific change that PJM was proffering under 205, having filed under 206 would let FERC craft a different solution if it believed that was just and reasonable. The interveners seem to essentially argue that FERC is always powerless to set aside, even on a prospective basis, auction-set prices for an upcoming year. And you argue that that would mean FERC is essentially powerless to set aside any price because every price is generated for some future period. And there's a rule involved that states that's the price that will be charged for the coming year. And can you just sort of explain, to the extent you're familiar, how this works outside the auction process and how—whether that would be distinct in any way that would bear on this argument? So how do formula rates work? Well, I was going to go to a different example, Your Honor. Yes, please. Instead of conducting an auction to determine with whom PJM would contract and at what price and for how much capacity, in theory, PJM could negotiate individual contracts with individual sellers for capacity. Those would be familiar market-based rate contracts entered into under the seller's market-based rate authority. And there's no question that FERC has authority to review the justness and reasonableness of those transactions under Section 206. The standard may differ based on whether Mobile Sierra applies, but there's no question that FERC has Section 206 power over those rates. So the interveners argue that power providers aside, the file rate doctrine itself protects this auction set rate and the particular parameters chosen back in February of 2022 from change before the delivery year. And they point to, in a briefing, some provisions of the tariff that they say compel that conclusion. And I know your argument is that FERC didn't deny the complaint on this basis, so we can't affirm on that basis. But can you address that argument just on its merits? How do you read those provisions? I would say two things, Your Honor. First, targeting back to the analogy I used with Judge Garcia, if instead these were market-based rate contracts individually negotiated, and let's say they were reduced to writing, those contracts would say, here's the price, and PJM must pay this price during the delivery year. Every executory contract requires payment of the filed rate, even if there's a tariff rate that doesn't explicitly require it. That's the import of the filed rate doctrine, that the rate must be paid until it is changed prospectively by FERC under 206. And the fact that the litigation was filed and the 206 complaint was filed makes it prospective, even though now it would be in the past. Correct. The complaint was filed before any capacity was delivered or any payments were made. You rely some on Citadel. Does it make a difference that we're dealing with forward capacity auction here and there? We dealt with a change to a tariff that was governing the real-time energy market. Well, we rely on Citadel primarily for the notion that imposing a dramatic price increase for no reason, for no benefit, and in this case for no economic or reliability purpose, is itself unjust and reasonable. It helps to define what is unjust and unreasonable. I recognize, Your Honor, that in this case we're talking about forward capacity auctions, and in that case we're talking about energy transactions. But in both cases, the changes that were sought would operate prospectively as to future energy sales or future deliveries and payments for capacity. And then the notion of a refund before the price has been paid during the delivery year is just, as you say, it's an offsetting if it hasn't been paid. And in this case, we filed the complaint. In this case, because of the Third Circuit litigation, the timing was compressed, so KGM reran its auction just days before the new delivery year. We filed our complaint while the case was pending on remand, and as a result, KGM went ahead and reran the auction and produced the higher prices that are being collected during the delivery year. They should be subject to refund. The entire delivery year is within the Section 206 15-month refund period. And in terms of what the filed rate is, I mean, the filed rate is the formula, but the filed rate is also the parameters chosen at the requisite dates to plug into the formula. Is the filed rate also the price that the auction produces? Like, when we talk about the filed rate, it's, you know, in the old days, the rate was price paid to the... It becomes confusing, Your Honor. I think the confusion is this. There's a buyer and there's a seller, and in the ordinary case and the ones we're all familiar with from decades of the Federal Power Act, the seller files a rate, and that's it. There's one rate, right? Here, what you have is market-based sales of capacity by the sellers to PJM, but PJM's side of it is being dictated by the terms of its tariff, so the tariff is determining, in the first instance, how much capacity PJM is going to buy from whom and what price, and it's resulting in new subsequent filed rates for the sale of capacity pursuant to the market-based rate sellers' market-based rate authorizations. So they are both rates. Okay. The formula's the rate, the chosen parameters going into the formula part of the rate? So the part of the rate that dictates the rate-setting procedures and requires the posting of the liability requirement would be part of PJM's filed rate. The specific liability requirement itself, the number, isn't specified in the tariff. That's something that PJM develops. But a process for selecting it is specified in the tariff, and it had to be in February 2022, it had to be specified and made public by then, right? Correct. So the number is not part of the rate? No, I think you could— The variable, the variable within the formula— I think you could consider it part of PJM's filed rate. Again, that's distinct from the auction results, which are themselves market-based rates subject to FERC's authority. Right. And I would add, Your Honor, that you can find that inherent in public citizen, which rejected public citizen's claim that auction-set capacity prices had to be filed with FERC under Section 205 before they could take effect, and the response was, no, that's not true because that's not how market-based rate sales work. Market-based rate sales, the initial authorization is the finding that sellers lack market power, right? Then transactions are entered into, but FERC has authority to review the justness and reasonableness of the market-based rate tariffs, even though they are not filed with FERC. If somebody files a complaint, FERC can review it. The only question is what standard? And you can find that in the Supreme Court's Morgan Stanley decision. It's inherent in this Court's New England Power Generators decision on review of debt and power and in public citizen. It's just this different from public citizen in the sense that there, it's the sellers who kind of undercut, the seller's exercise of market power undercuts the initial authorization that they don't have market power. Here, it's FERC that undercuts the determination. Does that make a difference? No, Your Honor. And first, I would say that in public citizen, there were multiple things going on. There were, in fact, allegations of market manipulation or exercises of market power. But what enabled that to have an impact on the prices were flawed market rules, including a flawed local sourcing requirement, which is the analog to the reliability requirement here. And in this case, the outcome is exactly the same. I mean, in this case, what happened was instead of a withholding of supply, there was an overestimating of demand. And the overestimate was not only more than was needed, but also more than was even available in the zone. As a result, there was an artificial shortage, which means that all sellers in that zone had market power, and prices rose to an arbitrary cap. Okay. We'll give you a couple minutes and reply. Thank you, Your Honor. Thank you. Mr. Perkins? Will you please support Jason Perkins for the commission? The Third Circuit did not leave room for the commission to solve this problem yet a second time. From the way the case was decided, presented to FERC in the beginning, when it was decided by FERC and then presented to the Third Circuit, the whole setup of the case was that there had been a problem already and could FERC fix it. The determination of the Third Circuit was it was too late. And in this follow-on proceeding, we were asked to take another look at the same rate to address the same situation, and the question was whether or not it was too late. And we decided, of course, to follow the mandate of the Third Circuit that was clear and unambiguous straight out of the interpretation of the PJM tariff, which is the readout file here. So to address some of the Court's issues or questions topside, yes, we are dealing with the same economic effect here. Essentially, the parties have only identified two different points on the supply-demand charge. It is the same economic, their fix is the same economic effect, but the route to get there is very different. And the legal question in this case is whether this resulting price is unjust and unreasonable under Section 206. And I don't think the Third Circuit was presented with that question, were they? Not precisely the same question. The question they were presented with was the calculated and posted LDA reliability requirements, they called it. What effect does that have in the process? And they determined that it must be used in the auction, and they derived that determination straight out of the language of the PJM tariff. Now, of course, we argued for a different result in that case, and our theory was that until the process ran its course into having capacity commitments that are secured, it's not retroactive. The Commission can still make changes, squarely and soundly rejected in that case. And so we can't square the result here, the suggested result here with that reason. Rejected as the tariff amendment, but not addressed with respect to whether the tariff rate was unjust and unreasonable under 206. It was not reviewing a determination of whether or not it was unjust and unreasonable, but to Your Honor's earlier discussion about the original presentation of the case, the 205 filing, and the 206 filing, essentially the 206, the original complaint filing from PJM was an invitation for FERC to decide whether or not anything wrong had happened in the early parts of the process. And there's a certain path dependency to how the Commission decided it. It decided because the tariff fix was not retroactive, it could go ahead and take that route. And it didn't really develop the record any further as to whether or not there was something wrong that happened that would enable a substitution of a new rate entirely. And as we pointed out in our brief, there was some suggestion carried through the case from the original intervener petitioners that perhaps a full reset of the entire auction might have been a path not taken. And that sort of logic is also not consistent with how the Third Circuit decided the case. But it seems to oddly obviate a very central responsibility of FERC under the statute, which is that FERC has to determine under 206 whether a rate is just and reasonable. And it didn't do that here. It sort of put the cart before the horse by saying, well, we don't need to do that because however it comes out, the relief is unavailable. So if FERC believes, for completely different reasons from justness and reasonableness, or unjustness and reasonableness, that a potential rate is unavailable, it can just skip the unjust and unreasonable inquiry. I see so many of our cases saying that it's FERC's job, not the complainant's job, to confirm that a rate is just and reasonable. Generally speaking, that's right. I think that the second part of the inquiry has been identified as being the commission's job to set the, as we would call it, the just and reasonable replacement rate. But when there is essentially no flexibility left as to setting a new just and reasonable replacement rate because the filed rate doctrine is attached, that's a different situation. But, I mean, public citizen was a, it was a rate that was, you know, under the filed rate doctrine. But unjustness and unreasonableness is an inquiry that the commission applies to filed rates. The, specifically in public citizen, it was an auction result. We agree with that. But there was no discussion of any particular provisions of the mid-continent tariff that would have necessarily put that result beyond FERC's reach. That was the question that was set up in our provider's case. So why wouldn't, if that's right, why wouldn't, I mean, would FERC approve a tariff that included a term saying, and by the way, this tariff waives any right to assess the rates it produces for justness and reasonableness? Is that something that FERC has ever approved? And if it came before the commission, is there a reason why, any authority to approve such a tariff rate? I'm not aware of a specific example of that. This tariff does include language about when the result becomes finite. And so that's. But it's subject under myriad determinations, FERC and of this court, to review for whether it's just and reasonable. Under certain circumstances, it could be. But the issue of the filed rate doctrine basically takes this into a different realm in the sense that if you look at this court's decision in Oklahoma Gas, for instance, where Southwest Power Pool was trying to figure out how to come up with a formula to charge or reimburse for certain charges for use of certain facilities, it was a complicated process. It took Southwest Power Pool something like eight years to figure out the right way to do it. And they claimed that everyone was on notice. They were trying to fix the problem. And so when they wanted to back bill for all of that time, they said, everybody knew we were going to do this. But the tariff itself had a limitation of only one year looking back to bills. And we gave effect to that. This court affirmed it. That is the sort of situation we're dealing with here. It wasn't the result that we advocated for in power providers, but the way that the Third Circuit decided it. So that attached earlier in the process. If the power provider's case had never been brought and all we had was the auction runs, there's a price, and they argue it's unjust and unreasonable. Has FERC taken a position on whether changing that price prospectively, there's no dispute that this is literally prospective as to the price. Have you taken a position as to whether that would violate the filed rate doctrine? Not specifically here. And so I think it's hard to say for certain. Have you, has FERC in another case taken, I presume someone would have told us. This issue just hasn't come up. Not in this particular type of context. Not that I'm aware of. And so why would it be any different than what Petitioner's counsel says, which is, this time the price was set by an auction, but you might set it by a formula or a market negotiation. And every time they're going to agree, you know, thou shalt charge this price for the upcoming year. And we all know you can set aside that price, not if it's already started being charged, but for the remainder of the period if it's unjust and unreasonable. And it's hard to see the Third Circuit as being presented with that question. And frankly, I'm a little skeptical that there is some kind of vested right from an auction. So I'm sorry, I guess my question is, it does seem like the intervener's position would immunize not just auction rates, but every rate from being set aside as unjust and unreasonable. It would be much harder to set aside a rate. That's right. And we would have to do an analysis of each individual tariff provision and how they actually interact with the rate and whether or not the rate has been settled. I mean, this is one of the reasons why the Commission did not adopt the Third Circuit's perspective from the beginning, is that it does seem to bake in many more steps to the process than the actual end result, which is the clearing price and the capacity commitments. But it seems like you're then giving up something that the Third Circuit didn't even claim. You know, it didn't do a Section 206 analysis. It's really looking at whether the tariff could be amended to resolve the problem apart from any review for justice and reasonableness. And it just seems unprecedented to then say, well, because this different path to the same or similar outcome comes to the same or similar outcome, that that too is disabled. I mean, even where Mobile Sierra applies to, you know, and there's an option set rate, you know, the 206 inquiry is assumed to apply. Mobile Sierra is just a presumption and what rebutts it, but a showing of that the rate is unjust and unreasonable. And as the Plaintiff's Council explained, or Petitioner's Council explained, that there is a difference here where the burden is shifted. So it's not the inquiry that the Third Circuit ruled on. It's a different question. Well, to explain, you know, why the commission reached the result that it did, if you look at pages 401 to 402, really sort of the end of the Third Circuit opinion, it cites this court's cases on the filed rate doctrine. It explains predictability as important. The doctrine forbids post hoc tinkering. It cites the dissent from Commissioner Danley that did not think the change was possible here. So all the signs that we were getting from the Third Circuit opinion was this rate result is already attached. It is beyond FERC's reach. It is like, you know, Coma Gas did periods before where Southwest Power Pool had told people they were going to make a change, but they hadn't actually done it. So it might be totally reasonable that FERC, you know, humbly interpreted the decision that way. But I think you've agreed that the Third Circuit just simply was not presented. FERC might be right that you still can't change the price. It was not presented with the question, does it violate the filed rate doctrine to set aside this price? And that seems like something FERC needs to address. Well, respectfully, we did in the paragraph 10 of the rehearing order. There is a very important distinction that we're making here, and I hope it helps answer some of the Court's questions from this discussion. It's on JA-293. It's Rehearing Order, paragraph 10. And it says that PJM's tariff specifies the rules for calculating the rate, i.e., the auction clearing price. And the Third Circuit found that under those rules, in applying the filed rate doctrine, PJM must use the originally posted reliability requirement to produce the rate. And so we're talking about a change to the formula after it's already been run. And that is the problem, essentially. But that's the change to the formula, which you can do a rebate analysis without any change to the formula. The formula's been honored. The auction's been run. Prices have been produced. Well, we have made distinctions between, like, the pure tariff rate. Like, the utility says the price is X. And counsel for the customers talked about the bilateral contract rate, where the rate is A will sell to B at the price of X. This process is the rate, essentially, because it's the entire process PJM used, multi-step process, to figure out what a market outcome might look like if all those buyers and sellers got together. But PJM is taking that on and taking the steps and doing all the work to figure out what the right clearing price is in each one of the zones that it has to consider separately. And so if we are to come back and readjust the process later, it is going to affect what the outcome would have been the whole time. And that's sort of why we see the Third Adopt that particular view of how the file rate doctrine works. We will give it effect in this case because it has already gone to judgment. And we thought it was obvious with the Third Circuit. Is there anything that says, so if you had a different case where an auction went awry by assumption and the price is too high, it's not obvious that you have to rerun the auction to set the just and reasonable replacement rate. Maybe you can look to the rate that was reached in another neighboring geographic area and just sort of choose that rate. Does that sound right? FERC would have sort of remedial discretion in how it arrived at the replacement. Right. The underlying problem here being, as we said in the original order, there was no economic or reliability justification for the actual result reached. If FERC developed a record to figure out what result would have an economic or reliability justification, then yes, the Commission would be able to set a new price, determine what the quantity would be. We're talking about prices and quantities, and FERC could come up with a different solution to that, assuming that there is a developed record to make an informed choice. But in terms of when the Commission can reach back retroactively to disturb results that might otherwise seem final, I mean, the public citizen case, we read that as being a case about market manipulation where there was an independent violation of law. And so there was a problem that subverted the filed rate. So it didn't get into discussions of the filed rate, but there was a violation of law alleged there that the Commission didn't reasonably explain or respond to. And so that is somewhat of a different circumstance than what we have here. That's why it doesn't really answer the question about disturbing auction set rates in this context. And just to clear, I appreciate the portion of paragraph 10. Paragraph 17 says, the Commission's authority to otherwise modify auction set rates, otherwise meaning absent this Third Circuit decision, is not at issue. In other words, we are not telling you whether we could set aside this auction-based rate if not for the Third Circuit decision. So this case is just about did the Third Circuit decision foreclose you from addressing that question? Right. Correct. Okay. Thank you. Any more? Okay. Thank you. Thank you. Good morning. May it please the Court, Paul Hughes for the interveners. Petitioner's complaint is an effort to circumvent the Third Circuit's decision. In light of that holding, FERC did not act arbitrarily capriciously for two reasons. The first is that the Third Circuit's P3 decision required a specific result using the LDA reliability requirements. Because Petitioner's complaint seeks to undo that result, FERC was not arbitrary and capricious in rejecting the challenge. Second, apart from the Third Circuit decision, the filed rate doctrine does bar the Section 206 complaint that Petitioner's have brought. We'd be happy to start anywhere that the Court may wish. To start, though, with the first question that jumps to mind is that I think FERC just said they didn't take the second position. So even if you're right, one view would be that's not a basis for affirmance. Do you have a response to that? Your Honor, at the rehearing decision at paragraphs 13 and 14, I know it's characterizing the Third Circuit, but what FERC said was the Circuit found that this result was required irrespective of the possibility of any harsh result in this case as an application of the filed rate doctrine, which flows from the text of the Federal Power Act. And then at paragraph 14, it goes on to distinguish case law because it wasn't addressing the filed rate doctrine. So I do think what FERC is recognizing is that the filed rate doctrine is doing the work here. But what I think FERC is recognizing correctly is that P3 has essentially resolved this question because in P3, for example, the Court recognized that one of the arguments that the Commission had made in first accepting PGM Section 205 filing and the action before it was, quote, the panel, and this was FERC, concluded the tariff amendment was not retroactive because the auction had not yet obligated any to provide capacity or determine clearing prices. So the kind of argument that because this was prospective on later prices or delivery was before P3, that was an argument that FERC had rested on in finding and approving PGM's proposed 205 filing for the tariff amendment. And P3 had no problem rejecting FERC's entire position there. I think petitioners would say that that's all well and good, but the actual issue in front of the Third Circuit was whether you could change the rules of the auction. And it is a legally and logically distinct question whether you can set aside the resulting price that comes out of that auction. That latter question simply wasn't presented in the Third Circuit. Your Honor, I don't think the Third Circuit viewed those as two distinct issues, and that's because in its own opinion, it recognized the separate part of the case, which was what FERC had relied on before, was the prospective effect on rates. And that didn't have any bearing on what the court ultimately held. And I don't think there was any suggestion that if the 206, the PGM-206 filing had been present in the Third Circuit, which the Third Circuit acknowledged the existence of, that there somehow would have been a different result. And I do think— And I do think that in paragraph 10, the final sentence, which I think your friend from the Commission points to, it rejects petitioners' argument because they ask that the Commission set aside recalculated auction rates by ignoring the Third Circuit's determination that PGM must use the posted LDA reliability requirement in the 2024-2025 auction, in the auction. And they did that, right? They used that in the auction, rerun. It doesn't answer the question whether they must charge that rate ultimately to load. Well, your Honor, I think it's quite revealing that petitioners' argument here is that the February 23 auction results that did not use the LDA reliability requirement is their chosen remedy. That's where I think FERC was quite right in saying, this is what petitioners have asked for in this case, is a return to the February 23 auction results. And that is what the Third Circuit explicitly rejected. So if that auction had never been run, and so that rate, the hypothetical and rejected lower rate, never been generated by auction, then you wouldn't have this sort of marrying of the auction-generated rate to a just and reasonable remedial rate. And if we're in that world and petitioners just said, look, this rate, unjust, unreasonable, FERC should use this remedial authority to model a rate without this erroneous parameter, would you have the same objection there? Well, yeah, I think there are a bunch of different ways to approach that question. So the first is, we are in a sui generis situation where what we have here is a Third Circuit decision that I think FERC did quite well in understanding on remand what it needed to do in order to accord with the clear mandate of the Third Circuit. And I think the mandate of the Third Circuit couldn't have been clearer. The PJM did not use the calculated and posted LDA reliability requirement as the tariff required. The tariff amendment is therefore retroactive. So I think there's an easy way- It's about the tariff amendment. So do you have a yes or no answer just so that I'm not distracted looking for it? If we had had a situation like this, but there were no February 2022, was it 22 or 23, re-run auction, if there was no effort to amend the tariff midstream, there was just the first auction, high rates, and FERC then looks at that under 206, whether that rate is unjust, unreasonable, anything barring it from changing that rate. Yes, Your Honor. So I understand the hypothetical. There's no P3 decision. There's no Third Circuit review of the 205 adjustment. Is that right, Your Honor? You're just suggesting that there was- And there's no February 23 auction. Right. So, Your Honor, if we assume that the auction was just run as it was from the get-go, and so we set aside the oddity of the, well, everything that happened around the Third Circuit and P3, which I think puts this case in a wholly different camp. But if we just settle on that, that is where the filed rate doctrine absolutely does apply. That's the second half of our brief. Now, I don't think the court has to resolve any of that to deny the petition because I think just saying that FERC followed what the Third Circuit said it needed to do resolves this case. But again, to answer the court's question, the filed rate doctrine, as Oklahoma Gas and a legion of this court's cases make clear, is the filed rate doctrine does apply to a market-based tariff. And when it applies to a market-based tariff, then the question is, is the nature of what is being challenged, is it retroactive or is it prospective, right? That's the critical question. And the Third Circuit answered this question in this particular case. Now, I appreciate- But it might be, your view is effectively retroactive as to the rules of the auction. And their view is it is obviously not retroactive as to the price to be charged. And so someone would have to resolve the tension between those things. And the Third Circuit didn't. Well, I disagree with that, your honor. So first, I think the Third Circuit did resolve that specific question. Now, one could disagree with the Third Circuit's resolution of that. But that's where I think there's an inter-circuit comedy issue, where because petitioners have chosen to come to this court rather than the Third Circuit, they're essentially asking this court to stand in judgment of the Third Circuit's determination that what actually is going on here is retroactive and not prospective. But second, the Third Circuit was right, because what the Third Circuit said is the later downstream prices, those come out of the auction and the requirement under the tariff rules to post the that for each of the later steps. What's the response to the suggestion that that argument means every price is immune from 206 challenge? Well, your honor, I think the answer is if a tariff is run according to its tariff terms, the filed rate doctrine does apply in those circumstances. So if you negotiate a price and file with FERC so that the filed rate says, in the upcoming year we will charge X amount, and it turns out X is unjust and unreasonable, you can't set that aside? That is the very purpose of the filed rate doctrine, your honor, is that you don't do retroactive X post look. In order to have a market-based tariff system work, you have to have confidence in those auctions. On a prospective basis, FERC can never set aside an unjust rate? Sorry, let me be clear, your honor. The question to that is, is the setting aside that you're suggesting, is it the setting aside, does it have simply prospective effect? And if the answer to that inquiry is yes, it is simply prospective, of course, you can set it aside under section 206, consistent with the language in 206A. In terms of prospectivity and retrospectivity on your theory, when does the rate get locked in? What's the fulcrum for purposes of prospectivity or retrospectivity? Is it when the parameters are set? Is it when the formula is announced and approved by FERC? When the first offer has been made? I take it it's not when the customers actually pay for the power. So let me say at the outset, your honor, as we discussed at footnote three, I'm standing up for multiple intervenors, which includes PJM. PJM and the generator intervenors may not see the answer to that question in identically the same way, but all of those intervenors are here today because they think whatever the answer to that question is, that this is safely past the point where retroactivity attaches. So I just want to be precise in that. But, your honor, I think it's clear that when what the Third Circuit said here is correct, which is you had legal consequences of the posting of the LDA reliability requirement, because that incensed behavior by the generators in order to secure capacity, that is the reliance that the whole market is designed around to have them then submit their bids into the capacity auction and then for actions to continue. That is where certainly there is attachment of filed rate, which is what the Third Circuit and P3 said. So again, even if one were to think that's wrong, that would be contradicting what the Third Circuit said in this very dispute among these same parties. Just one last question. I think you just started getting at reliance. Can you explain in sort of practical terms how a bidder could have relied on the clearing price in making their bid? Or are you making a different argument about reliance? No, they're relying, your honor, on the parameters because the parameters that get posted that then are obligated pursuant to the tariff to be used, one can understand what effects those are going to have potentially on what the market is going to shape up to look like. And then that incents bidder behavior. So your clients knew that the auction was going to result in a 4X price? Would that be a windfall to them? No, I'm not suggesting they know that there was going to be one particular price or another, but the evidence in the record... That's why I just don't know how they could rely on the outcome of an auction unless they were, you know, colluding in advance. There's no suggestion anywhere... I'm not suggesting that either. That's why I'm confused about how you could... You would need to know that how many people were going to put in and at what price and that this weird outcome was going to result. Let me just give one example that's in the record in our brief talks about, your honor, is the intermittent resources like solar and wind. If they're going to bid into the capacity markets, which they had some ability to be able to do, they might, because they can't necessarily guarantee that they're going to be able to run and there are significant penalties if there is a capacity call and they don't run, they may have to engage in underlying hedges in order to be able to balance that out. In trying to have a prediction as to what this market is going to look like, it's going to have a real effect on whether or not certain wind and solar resources are going to bid into the capacity markets. And so they need to be able to have the certainty of the LDA reliability metric. So they say, look, okay, this is... I can bid into here and then I can go and safely essentially obtain a hedge on my capacity requirement in the event that there's a capacity call. And for any reason, I'm not in a situation to be able to... They can rely on the capacity that they're... For persons with capacity, they couldn't predict the price that's going to result. Well, that's right, your honor. There's not a direct prediction, but this is where, again, this goes to the whole reason why the filed rate doctrine is so essential with market-based tariffs. Now, can the rules of the tariffs be changed prospectively for future auctions? Absolutely, which is what the third circuit in P3 said, that this tariff amendment, the third circuit found it only can be struck as to the already run auction, but not as to future auctions. And to the court's question, what happens if you had some extraordinarily long auction period or something like that? I'd suggest, your honor, that would just be a problem under section 205, that sort of locking in some period could be determined to be unjust and unreasonable because it's true that you can't predict the future. But the question is, and this is where the distinction between prospective and retroactive, I think, does the work. In order for there to be market-based rates, there has to be market reliance on how that auction functions. And so you can't tinker with the rules of the auction after it's been run. If what you're doing is making something that is purely prospective, that's not changing effectively the results, the rules of the auction, then you're in a different situation and the file rate wouldn't apply. Mr. Hughes, about the tariff, the attachment double D, the paragraph 11E, which talks about errors, and PJM can discover an error, and as long as it promptly notifies, that can be corrected. And your position on that is what? It's what the third circuit said, your honor, which is that error provision simply doesn't do the work that's needed here, that that would be reading far too much into this and that PJM didn't think that would do the work. They didn't invoke the error provision. Instead, they did a tariff amendment. And again, this kind of gets back to one maybe could disagree with what the third circuit held, but we think that's why the easiest way to resolve this case is exactly what FERC said, is FERC didn't have flexibility from the mandate of the third circuit. It did exactly what the third circuit said it should do, and the petitioner shouldn't here essentially be able to collaterally challenge the holdings of the third circuit, which includes, for example, how you interpret the error provision of the tariff. So your view is that the rate paid for electricity to be sold in the future, in the year for which the capacity auction is providing, must be the auction price, period, end of story? That is typically under the filed right doctrine, yes, your honor. If the tariff is clear about that. If it is pursuant to the tariff terms, if the tariff is filed, that is the filed right doctrine protects market participants so they can rely on the tariff. And the court has been clear that the results of that can be harsh, but this is also a two-way street. So in Old Dominion. We read that. So the rate is set when the auction clears? No, it's set far, in your view, it's set well before the auction clears. It's set when? Again, this is where interveners may have different views. When an auction, though, has been run, everybody agrees that it has been set, and that resolves this case. And the role for 206, I know I've asked you this already, the role for 206 under your view, where the filed right doctrine applies, it obviates, largely obviates 206 review? Yes, your honor, except for if what the 206 complaint is doing is looking prospective. And the example here is one can file a section 206 challenge to a PGM market-based rate tariff, just not for the tariff for the auction that's already been run. Right. So you have no problem with the amendment insofar as it applies to years past the 2024-2025. That's not in this case, and that's amendment is going to be effective. Yes, your honor. So for example, if PGM had not done this amendment prospectively, if the petitioner's claim was we need to person, they bring a 206 complaint and say applying this LDA reliability requirement for a future auction is unjust and unreasonable, section 206 absolutely would have traction there because what you're not doing is applying something retroactively to past conduct. That's the critical feature where the filed rate doctrine has to preserve a conduct when there is past conduct that is not subject to subsequent challenge. All right. Thank you. Mr. Horwich, why don't you take two minutes? Thank you. The key to this case is that auctions are rate-setting procedures that set rates for future sales under the seller's market-based rate authority. My friend from the commission read from paragraph 10 of the rehearing order, which I think bears on this question. That paragraph says that PGM's tariff specifies the rule for calculating the rate, the auction clearing price, and it goes on to say that PGM must use the originally posted reliability requirement to produce the rate. That's the rate for the future sale of capacity, and under the Federal Power Act, setting a rate does not immunize it from change. This case is solely about FERC's power under section 206 to change an auction-set market-based rate, not the wisdom of doing so. My friend from the intervenors claims that once an auction is run, that's it. FERC has no power to change the auction clearing price. I would submit that that is very difficult to reconcile that position with the language of section 206 with FERC's decision in Devon Power, which this court affirmed in New England Power Generators, where FERC looked at that case, looked at the question of how it would review auction-set capacity prices, decided on the case that it had discretion to apply a Mobile Sierra presumption, which is a rebuttable presumption that auction-set prices are just and reasonable. But that's the thing. Even where a Mobile Sierra presumption applies, the presumption is rebuttable, which means the complainants need a chance to rebut it. So you had said, I think, when you were standing up earlier, that FERC would have had the authority to set its own prospective rate, even if it felt like it couldn't prove the exact rate as before because of the Third Circuit's decision. Could you say a little bit more about what that would look like? You know, what realistically FERC would have been able to do? So I think that Citadel actually provides a template for that, potentially. Citadel involved the suspension of a penalty-constraint factor, which is essentially a market price cap in the energy market. FERC found in that case that allowing prices to rise to the cap because of a shortage of power due to transmission line maintenance, a short-lived problem that the entire market knew was going to be fixed, similar to this short-run problem of a mistaken parameter. It didn't make any sense to allow prices to rise to the cap in that context because doing so would do no good. It would elicit no new supply. It would elicit no transmission construction. So FERC's remedy in that case was, I believe, to set the price equal to, not to the cap, but to the highest actual offer submitted by a generator to supply power in that case. That would be one example. I'm not saying that that is the relief that we're requesting, but that's an example of what FERC could do. Thank you.
judges: Henderson; Pillard; Garcia